# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE LIBERTARIAN PARTY, *et al.*,

        Plaintiffs,

        v.

DISTRICT OF COLUMBIA
BOARD OF ELECTIONS AND ETHICS,
*et al.*,

        Defendants.

Civil Action No. 09-1676 (BAH)

## MEMORANDUM OPINION

    This case arises out of the November 4, 2008 election for President of the United States. The central issue is whether a District of Columbia election regulation governing the reporting of write-in votes unreasonably infringes upon Plaintiffs' First Amendment speech and associational rights, as well as their rights to due process and equal protection under the law. Pursuant to a D.C. election regulation, Defendant District of Columbia Board of Elections and Ethics (the "Board") is only required to tally and report the *total* number of write-in votes cast in an election (not the total for each write-in candidate), unless the number of write-in votes could potentially have a determinative effect on the election's outcome. Plaintiffs – who are the Libertarian Party, its candidate for President of the United States in 2008 (Bob Barr), and its three candidates for presidential elector from the District of Columbia in 2008 – argue that the Constitution requires the District of Columbia to tally and report the number of write-in votes for each candidate, regardless of the potential effect on the election's outcome. Plaintiffs argue that the number of votes for each write-in candidate must be reported as part of the official election results, which are usually certified and released by the Board within 10 to 15 days after the election. For the

reasons explained below, the Court finds that neither the Board's actions nor the District of Columbia regulation itself impermissibly burdened Plaintiffs' constitutional rights.

## I. Factual and Procedural Background

The facts of the case are undisputed. Plaintiff Barr was the Libertarian Party candidate for President in 2008. Pl. Stmt. of Mat. Facts ¶ 1. Barr ran as a qualified write-in candidate in the District of Columbia. *Id.* ¶ 8. Plaintiffs J. Bradley Jansen, Rob Kampia, and Stacie Rumenap were D.C. voters who were also Libertarian Party candidates for presidential elector for the District of Columbia in 2008 pledged to Barr. *Id.* ¶¶ 8-10. The Defendants are the Board, the Mayor, and Attorney General of the District of Columbia in their official capacities.[1]

With respect to the tallying and reporting of write-in votes, the District of Columbia Municipal Regulations, Title 3, provides, in relevant part:[2]

| 806.12 | The total number of write-in votes marked by voters shall be reported for each contest. |
|---|---|
| 806.13 | The total number of votes cast for each write-in nominee shall be calculated only in contests where there is no candidate printed on the ballot in order to determine a winner, or where the total number of write-in votes reported, under § 806.12, is sufficient to elect a write-in candidate. |

D.C. MUN. REGS. tit. 3, § 806 (2010).

Following the vote in the November 2008 presidential election, the total number of write-in votes in the District of Columbia was not sufficient to elect a write-in candidate. Indeed, there were only 1,138 write-in votes out of a total 265,853 votes cast. Declaration of Errol Arthur, Chairman of the D.C. Board of Elections and Ethics, dated Jan. 6, 2010, hereinafter "Arthur Decl." ¶ 9; Federal Election Commission 2008 Presidential General Election Results.[3] Barack

---

[1] The Mayor and Attorney General have joined in the submissions of the Board in this action. ECF No. 21.
[2] This section of the D.C. Municipal Regulations was amended on November 26, 2010. Previously, the pertinent sections appeared at §§ 808.15 and 808.16. The recent amendments made no material changes to the regulations at issue before the Court. The Court will use the current section numbering and text.
[3] The Court may take judicial notice of facts which are "capable of accurate and ready determination by resort to

Obama received 245,800 votes. Arthur Decl. ¶ 9. Pursuant to § 806, the Board did not tally and report the total number of votes for Plaintiff Barr because neither of the circumstances that would trigger a tally for each write-in candidate under § 806.13 were present. As a result, Plaintiffs argue, they are unable to determine the precise level of support for Barr and the Libertarian Party, in violation of their constitutional rights.

Plaintiffs first brought this action in Superior Court for the District of Columbia. On September 2, 2009, Defendants removed to this Court pursuant to 28 U.S.C. § 1441(b) and 1446. On November 9, 2009, Plaintiffs filed an amended complaint ("Compl.").

Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that their First Amendment speech and associational rights, as well as their rights to due process and equal protection under the law, were violated by the Board's actions, and, to the extent that the Board's actions were required by § 806.13, that the regulation itself is unconstitutional.[4] Plaintiffs seek a declaration that the Board's refusal to tally and report the number of write-in votes for each candidate is unconstitutional and that § 806.13 is unconstitutional as applied. They also seek an order directing the Board to tally the number of votes cast for Plaintiff Barr in 2008 and enjoining the Board from refusing to tally and report such write-in votes in the future. In addition, they seek attorney's fees and costs pursuant to 42 U.S.C. § 1988.

Defendants respond that the tabulation of write-in votes for each candidate is not a constitutionally protected right, and that, insofar as the right is protected, the reasons behind the

---

sources whose accuracy cannot reasonably be questioned." *Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366, 375 n.29 (D.C. Cir. 1983) (quoting Fed. R. Evid. 201(b) (2)).

[4] Plaintiffs' complaint asserts claims under the First, Fifth, and Fourteenth Amendments. The Fourteenth Amendment does not apply to the District of Columbia. *See Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954); *Roum v. Fenty*, 697 F. Supp. 2d 39, 45 (D.D.C. 2010). Instead, the Fourteenth Amendment's protections are applied to the District of Columbia through the Fifth Amendment. *See Bolling*, 347 U.S. at 499-500; *American Towers, Inc. v. Williams*, 146 F. Supp. 2d 27, 30 n.2 (D.D.C. 2001). The Court will therefore treat Plaintiffs' Fourteenth Amendment claims as Fifth Amendment claims.

regulation justify its application.  The parties dispute the appropriate level of review to be applied to Plaintiffs' claims.[5]

On November 23, 2009, the Board moved to dismiss Plaintiffs' amended complaint pursuant to Rule 12(b)(6).  On December 14, 2009, in response, Plaintiffs moved for summary judgment and opposed the Board's motion to dismiss.

On February 2, 2010, the Court notified the parties that it intended to treat Defendants' motion to dismiss as a motion for summary judgment pursuant to Rule 12(d).  *See* Fed R. Civ. P. 12(d); *see also Kim v. United States*, No. 09-5227, 2011 WL 192496, at *6 (D.C. Cir. Jan. 21, 2011); *Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007).  The Court provided the parties with a reasonable opportunity to present any additional material pertinent to that motion.

Both parties submitted supplemental briefing and material on February 11 and 12, 2011.

Oral argument on the cross motions for summary judgment was held on March 4, 2011.  The parties' cross motions for summary judgment are now before the Court.

## II.  Discussion

### A.  Mootness

As a threshold question, the Court must determine whether it still has jurisdiction to decide this case now that the 2008 election is long since over.  Under Article III of the United States Constitution, this Court "may only adjudicate actual, ongoing controversies." *District of Columbia v. Doe*, 611 F.3d 888, 894 (D.C. Cir. 2010) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). The mootness doctrine prohibits the court from deciding a case if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-

---

[5] On July 8, 2010, the Court requested the views of the United States Department of Justice and the United States Attorney's Office for the District of Columbia on the constitutionality of the manner in which write-in votes are tabulated in the District of Columbia.  In a report filed with the Court on July 30, 2010, the Department of Justice and United States Attorney's Office declined to take a position regarding this litigation.

speculative chance of affecting them in the future." *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)).

There is an exception to the mootness doctrine, however, for an action that is "capable of repetition, yet evading review." *Id.* This exception applies where: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quotation omitted). The first prong of this doctrine is clearly satisfied here. Legal challenges to election procedures often take longer to resolve than the election cycle itself. *See Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (collecting cases). The second prong is also satisfied because it is likely that the Libertarian Party and its candidates and voters will participate in future elections in the District of Columbia. While the District of Columbia has amended the regulations at issue, the amendments made no material changes to the relevant provisions. This case therefore satisfies the "capable of repetition, yet evading review" exception and is not moot. *See id.*

## B. Interpretation of District of Columbia Law

Before proceeding to the constitutional questions, the Court will briefly address a question of District of Columbia law raised in Plaintiffs' briefs. In their summary judgment motion papers, Plaintiffs contend that the Board's application of § 806.13, as well as the provision itself, is inconsistent with controlling local law as set forth in *Kamins v. Bd. of Elections for D.C.*, 324 A.2d 187 (D.C. 1974). *See* Pl. Summ. J. Mem. at 15-17. Plaintiffs' complaint asserts no causes of action premised on District of Columbia law; consequently, it is unclear what claims or remedies pertain to Plaintiffs' local law arguments. In any event, Plaintiffs' D.C. law arguments are unfounded.

At the time of the *Kamins* ruling, D.C. law was silent as to write-in voting. The Board then took the position that it was not permitted to count write-in votes in the U.S. presidential election. 324 A.2d at 190. The *Kamins* court disagreed, instructing "that there is nothing in the statute regulating elections in the District of Columbia which precludes the counting of write-in votes in a presidential election where such votes are cast for candidates for whom, as here, a valid slate of electors has been filed." *Id.* at 193. On remand, an order in a hand-written docket entry directed the Board to count the write-in ballots at issue and to promulgate a regulation to facilitate write-in voting. Declaration of Richard Winger dated Dec. 14, 2009, hereinafter "Winger Decl.," Attachment C. Plaintiffs argue that "[w]hile the Board may be in literal compliance with *Kamins*, its refusal to tally and report the write-in votes cast for Barr robs the decision of meaning." Pl. Summ. J. Mem. at 16.

The D.C. Court of Appeals has more recently interpreted the meaning of the District's current write-in voting regulations, which are at issue here. In *Best v. D.C. Bd. of Elections and Ethics*, 852 A.2d 915 (D.C. 2004), a voter sought review of the Board's decision not to count write-in votes in the Statehood Green Party ("Green Party") primary election. The Green Party's primary election plan called for the election of delegates based on a proportional representation formula. *Id.* at 917. Under the formula, any candidate who received 16.6 percent of the vote would win at least one delegate. *Id.* After the election, the total number of write-in votes was less than the plurality of votes received by the primary's winner. *Id.* However, write-in ballots accounted for 32 percent of the vote. *Id.* Because only 16.6 percent was necessary to win a delegate, a write-in candidate could have earned a delegate under the primary's rules. Regardless, the Board concluded that it did not need to tabulate the write-in votes by recipient because a write-in candidate could not have won the overall primary. *Id.* at 918. The Board

relied on the language of § 806.13, which requires tabulation by write-in recipient only "where the total number of write-in votes reported . . . is sufficient to elect a write-in candidate." *Id.* at 919-20.  The D.C. Court of Appeals disagreed.  The court held that in the context of an election to award delegates on a proportional basis, § 806.13 had to be read to require individual tabulation of write-in votes "so long as the total number of write-in votes is 'sufficient to elect a write-in candidate' *to be represented by a delegate*."  *Id.* at 921 (emphasis in original).  "The purpose of the election is determinative."  *Id.*  Thus, as explained in *Best*, § 806.13 requires the tallying of write-in votes by recipient where the write-in votes could have a determinative effect on the outcome of the election.

Significantly, the D.C. Court of Appeals in *Best* did not hold that § 806.13 required write-in votes to be tallied by candidate in all situations, as Plaintiffs would have it.  In addition, the opinion in *Best* specifically cited the D.C. Court of Appeals' earlier ruling in *Kamins*.  *Id.* at 919.  If the D.C. Court of Appeals viewed § 806.13 as inconsistent with *Kamins*, it presumably would have said so.  Further, Plaintiffs themselves have conceded that "the Board may be in literal compliance with *Kamins.*"  Pl. Summ. J. Mem. at 16.  Indeed, the record before the Court indicates that the Board's actions comport fully with D.C. law as set forth by the D.C. Court of Appeals.

### C.    Constitutional Claims

The Court now turns to the merits of Plaintiffs' constitutional challenge.

### 1.    Do Plaintiffs Have a Constitutionally Protected Interest?

The first question the Court must address is whether Plaintiffs have any constitutionally protected interest at stake in this case.  The Board argues that Plaintiffs do not have any protected

interest because, according to the Board, there is no constitutional "right to tabulation of all write-in votes for each recipient."  Def. Reply Mem. at 2.

The Supreme Court has recognized that restrictions on the right to vote may burden "basic constitutional rights" protected by the First and Fourteenth (or Fifth) Amendments. *Anderson v. Celebrezze*, 460 U.S. 780, 786-87, 787 n.7 (1983); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986).  For example, the Court has explained that ballot access restrictions burden "two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  Both of these rights, of course, rank among our most precious freedoms."  *Anderson*, 460 U.S. at 787 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)).  These associational rights are analyzed together—with little distinction drawn between ballot access cases and voting rights cases, or between the rights of candidates and the rights of voters.  *See Burdick v. Takushi*, 504 U.S. 428, 438 (1992).

The Court has held that these basic rights protect, for example, voters' and parties' interests in ballot access, *see Anderson*, 460 U.S. 780, 787; *Norman v. Reed*, 502 U.S. 279, 288 (1992); the ability of political parties to select their candidates, *see Tashjian*, 479 U.S. 208, 214-15; and the ability of political parties to organize themselves and determine their own internal governance, *see Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224, 229-30 (1989). In analyzing these rights, the First Amendment and Fourteenth or Fifth Amendment components are assessed jointly, without resort to a separate Equal Protection Clause analysis.  *See Anderson*, 460 U.S. at 787 n.7; *Norman*, 502 U.S. at 288 n.8.

Whether Plaintiffs' speech and associational rights extend to the manner in which votes are reported is a close question.  Citizens in a democracy express their political preferences

through voting, which "is of the most fundamental significance under our constitutional structure." *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Consequently, after an election occurs, the First Amendment provides some level of protection to the important expressions of political preference that voters communicated by casting their ballots. For example, it would be a violation of voters' First Amendment rights for a law to preclude entirely the tabulation and reporting of the outcome of a lawfully conducted vote. *See Turner v. D.C. Bd. of Elections and Ethics*, 77 F. Supp. 2d 25, 31 (D.D.C. 1999) ("Because voters in properly conducted elections intend to send a particularized message which is received by those who act on the results of the elections, voting results can be categorized as protected symbolic speech under" the First Amendment.).

On the other hand, the Supreme Court has previously declined to adopt a "party's contention that it ha[d] a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate" because "[b]allots serve primarily to elect candidates, not as forums for political expression." *Timmons v. Twin City Area New Party*, 520 U.S. 351, 362 (1997); *see also Burdick*, 504 U.S. at 438 ("Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently.") This Court does not need to decide the precise scope of Plaintiffs' speech and associational rights, however. Even assuming *arguendo* that these rights extend to the manner in which votes are reported, which the Court will do here, the Board has advanced an adequate justification for § 806.13 that outweighs any burdens the regulation places on Plaintiffs' rights. *See Timmons*, 521 U.S. at 369-70.

## 2. What Level of Scrutiny Applies?

Having assumed that Plaintiffs have a constitutional interest in the manner in which their votes are reported, the Court must determine the appropriate standard to apply in reviewing the constitutionality of the Board's actions and the regulation itself. Plaintiffs contend that the Court should apply strict scrutiny, while Defendants argue that rational basis review is appropriate.

There is no question that "voting is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (quoting *Socialist Workers Party*, 440 U.S. at 184). "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Id.* Because "[e]lection laws will invariably impose some burden upon individual voters," not all laws that impose burdens on the right to vote are unconstitutional or subject to strict scrutiny. *Id.* at 433-34. The Supreme Court has held that the "function of the election process is 'to winnow out and finally reject all but the chosen candidates,' . . . not to provide a means of giving vent to 'short-range political goals, pique, or personal quarrel[s].'" *Id.* at 438 (quoting *Storer*, 415 U.S. at 735). Accordingly, "[a]ttributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." *Id.* Therefore, the First Amendment interest in voting, including any interest in the reporting and tabulation of votes, is not unlimited and must not undermine the ability to operate elections effectively.

The Supreme Court set forth the framework for determining the appropriate level of scrutiny for reviewing a voting regulation in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).[6] Under the framework outlined in *Anderson* and

---

[6] As noted above, the analysis set forth in *Anderson* and *Burdick* applies jointly to the First and Fourteenth or Fifth Amendment rights embodied in the right to vote, so there is no need for a separate equal protection analysis. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 787 n.7; *Norman*, 502 U.S. at 288 n.8.

*Burdick*, the analysis is twofold. First, the court must "consider the character and magnitude of the asserted injury" to the plaintiff's constitutional rights. *Anderson*, 460 U.S. at 789. Second, the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* If the plaintiff's rights are "subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). But when an election law imposes only "reasonable, nondiscriminatory restrictions" upon the constitutional rights of voters, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (citing *Anderson*, 460 U.S at 788) (internal quotation marks omitted).

In *Burdick*, the Supreme Court applied this framework to uphold a Hawaii election law that banned write-in voting entirely. *Id*. at 441-42. *Burdick* does not settle this case outright, though, because, having granted citizens the right to cast write-in votes, the District of Columbia must confer the right in a manner consistent with the Constitution. *Cf. Turner*, 77 F. Supp. 2d at 30 (citing *Grant v. Meyer*, 828 F.2d 1446, 1456 (10th Cir. 1987)).

### a.    The Character and Magnitude of the Burden

The first step in the *Anderson-Burdick* analysis is to assess whether the law imposes a "severe" restriction on Plaintiffs' constitutional rights. Plaintiffs argue that the burden is severe for three main reasons. First, Plaintiffs assert that the severity of the burden imposed by Section 806.13 must be assessed within the overall context of the District of Columbia's total ballot access scheme, which Plaintiffs contend is quite restrictive. Pl. Reply to Def. Supp. Mem. at 2. Second, they assert that "by authorizing the Board not to certify and report write-in votes, [Section 806.13] effectively disenfranchises Plaintiffs Jansen, Kampia, and Rumenap." Pl. Summ. J. Mem. at 9. Plaintiffs argue that every voter's vote is entitled to be counted and

reported and that any legislation restricting that right is subject to strict scrutiny. *Id.* at 9-10.

Third, Plaintiffs argue that the regulation severely burdens Plaintiffs Barr and the Libertarian Party by infringing on the party's associational rights, including their constitutional right to create and develop a new political party. Pl. Reply Mem. at 5; *see also* Compl. ¶¶ 26-27. Plaintiffs argue that "a voter who casts a valid write-in ballot for a declared candidate like Barr is entitled to know whether she has acted in concert with other like-minded voters or whether her vote is a lone statement in the political wilderness . . . [and that] [t]he Libertarian Party is entitled to know whether its stature has grown or been diminished by the votes cast for Barr." Pl. Summ J. Mem. at 10. The court will address these arguments in turn.

Plaintiffs argue that the burden imposed by Section 806.13 must be assessed within the context of the District of Columbia's overall ballot access scheme, which Plaintiffs argue is highly burdensome. Pl. Reply to Def. Supp. Mem. at 2. As part of this argument, Plaintiffs note that while the Supreme Court in *Burdick* upheld Hawaii's outright ban on write-in voting, it did so only in the context of Hawaii's statutory scheme providing for otherwise easy access to the ballot. *Id.* (citing *Burdick*, 504 U.S. at 434-37). By contrast, Plaintiffs characterize D.C.'s ballot access scheme as "more burdensome" than that of 43 other states. *Id.*

The Court is not persuaded that the District of Columbia's ballot access scheme is unusually burdensome. To obtain a position on the general election ballot, the District requires minor party presidential candidates to submit a nomination petition signed by 1 percent of all registered voters, which would have required approximately 3,900 signatures in 2008. D.C. Code § 1-1001.08(f) (2001); Winger Decl., Attachment B. According to Plaintiffs' own submissions, other jurisdictions, including California and Georgia, have the same requirement. Winger Decl., Attachment B. In addition, under the Hawaii ballot access scheme in *Burdick*,

which the Supreme Court deemed sufficiently accessible to justify an outright ban on write-in voting, candidates had to run in an open primary before they could get a position on the general election ballot. 504 U.S. at 435. While the requirements to get on the primary ballot were liberal – non-partisan candidates could enter the primary simply by filing nominating papers containing 15 to 25 signatures – advancing to the general election was more difficult. *Id.* at 436. To advance to the general election, a nonpartisan candidate had to receive 10 percent of the primary vote or the number of votes that was sufficient to nominate a partisan candidate, whichever number was lower. *Id.* In the ten years preceding the lawsuit in *Burdick*, fewer than a third of nonpartisan candidates in Hawaii advanced from the primary to the general election ballot. *See id.* As for partisan candidates outside the major parties, Hawaii required a party petition to be filed containing the signatures of 1% of the state's registered voters – a requirement that is substantially similar to D.C.'s requirement here. *Id.* at 435. Regarding that requirement, the *Burdick* court observed, "We have previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Hawaii's one-percent requirement." *Id* at n.3 (citing cases). Thus, the Court concludes that the District of Columbia's overall ballot access scheme is not especially burdensome or severe. In addition, the Court notes that the regulation at issue in this case does not actually restrict access to the ballot at all, but only concerns the manner in which validly cast votes are reported to the public.

The Court now turns to Plaintiffs' argument that "by authorizing the Board not to certify and report write-in votes, Section 806.13 effectively disenfranchises Plaintiffs Jansen, Kampia, and Rumenap." Pl. Summ. J. Mem. at 9-10. As a factual matter, Plaintiffs overstate the effect of Section 806.13 by claiming that Jansen, Kampia, and Rumenap's write-in votes were not certified or reported. As the Board explains, "the 1,138 write-in votes for president were

counted, announced, and certified following the November 4, 2008 general election." Def. Reply Mem. at 4; Arthur Decl. ¶¶ 6, 9, 11. The Court finds this explanation to be factually accurate. Plaintiffs do not allege that the write-in votes cast by Jansen, Kampia, and Rumenap were not counted among those votes. In certifying and reporting the 2008 presidential election results, the Board complied with the requirements of the D.C. election laws. Arthur Decl. ¶ 11. Plaintiffs Jansen, Kampia, and Rumenap were not disenfranchised or denied access to the ballot, nor is there any credible claim that the Board failed to certify or report their votes as part of the write-in total. Rather, relying principally on dicta in the United States District Court's ruling in *Turner v. District of Columbia Board of Elections & Ethics*, Jansen, Kampia, and Rumenap claim they were "effectively" disenfranchised because of the manner or format in which their votes were counted, certified, and reported – i.e., because the Board refused to tally how many write-in votes Barr received specifically.

In *Turner*, the Court considered a constitutional challenge to the Barr Amendment, a rider to a D.C. appropriations bill that precluded the use of funds to conduct a ballot initiative that would legalize medical use of marijuana.[7] 77 F. Supp. 2d at 27. Congress enacted the Barr Amendment after the Board had already certified a ballot referendum on the legal status of medical marijuana in the District of Columbia, and after the Board had already printed the referendum initiative on its ballots, but before voting had occurred. *Id.* After the vote occurred, the Board interpreted the Barr Amendment as prohibiting it from certifying and releasing the referendum's results. *Id.* Although ultimately the Court in *Turner* avoided any constitutional questions, the Court concluded that *if* the Barr Amendment had precluded the counting,

---

[7] The Barr Amendment was so named because it was sponsored by Plaintiff Barr when he was a legislator in the House of Representatives.

announcing, and certifying of the referendum's results, the statute would have been subject to strict scrutiny and it would have violated plaintiffs' First Amendment rights. *Id.* at 34-35.

Turner is inapposite to the present case for several reasons. First, § 806.13 does not preclude the counting, announcing, and certifying of election results, as the Barr Amendment might have if the Court had not avoided the constitutional issue. Indeed, the 1,138 write-in votes for president *were* counted, announced, and certified following the November 4, 2008 general election, although they were not tallied by candidate. Arthur Decl. ¶¶ 6, 9, 11. The Barr Amendment, on the other hand, would have imposed a far more significant burden on voters' rights than any burden alleged here if it had precluded the release and certification of the results of a referendum. That would have directly interfered with the key "function of the election process" which is "to winnow out . . . all but the chosen candidates," or in the case of a referendum, to identify the public's chosen option. *Burdick*, 504 U.S. at 438.

Further, *Turner*'s dictum that "voting results can be categorized as protected symbolic speech," 77 F. Supp. 2d at 31, is not wholly on point here because the *Turner* court was referring primarily to the public communication of an election's decisive outcome. As the Court explained, "[t]hrough election voting, the public affects public governance by determining who holds office or which referenda properly before the voters will or will not become law." *Id.* Here, it is undisputed that (1) all write-in votes were counted and certified as part of the write-in vote total; (2) the write-in votes had no effect on determining who holds office; and (3) if the write-in votes would have had an effect on the election's outcome, they would have been tabulated by candidate as required by Section 806. While *Turner* identifies an election's results as "core political speech," *id.* at 32, *Turner* does not address the constitutional interests, if any,

that are implicated by the precise format in which those election results are communicated to the public.

Nor is there any indication that *Turner* intended to depart from the Supreme Court's well-settled precedents upholding "reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick*, 504 U.S. at 438. Indeed, the Barr Amendment was far from "politically neutral." If the Barr Amendment had prohibited the release of the medical marijuana referendum results, that would have amounted to a content-based restriction on speech concerning the merits of drug legalization. *Turner*, 77 F. Supp. 2d at 32-33. As the *Turner* court explained, the Barr Amendment would have been subject to strict scrutiny for that reason. *Id.* By contrast, *Turner* explicitly recognized that a lesser standard applies to "facially neutral election laws propounded in the name of efficiency." *Id.* at 33 n.4. Section 806.13 is exactly that – a facially neutral election law propounded in the name of efficiency. It does not present any content-based restriction on the speech embodied in write-in votes.

Finally, Congress enacted the Barr Amendment after the D.C. medical marijuana ballot initiative had already been certified and after the ballots had already been printed. That represented an unusual mode of interference with an election that was, in some sense, already underway. Here, there was no change to any electoral procedures during the course of the election process. Thus, the issue of casting a lawful vote "only to be told that that vote will not be counted or released" is not similarly presented in this case. *Id.* at 33. For all of these reasons, *Turner* does not suggest that strict scrutiny is the appropriate standard of review in this case.

In addition to *Turner*, Plaintiffs rely on *Gray v. Sanders*, 372 U.S. 368 (1963) and *Dunn v. Blumstein*, 405 U.S. 330 (1972) to argue that strict scrutiny applies here. These cases are also

unavailing. In *Gray*, the Court stated that "Every voter's vote is entitled to be counted once. It must be correctly counted and reported." 372 U.S. at 380. *Gray* does not further Plaintiffs' argument because (1) Jansen, Kampia, and Rumenap's votes were counted and reported correctly as part of the write-in total; and (2) *Gray* is otherwise inapposite because it concerned vote dilution under Georgia's county unit system, an issue with little relevance here.

Plaintiffs cite *Dunn v. Blumstein*, 405 U.S. 330 (1973) to make an equal protection argument. They assert that strict scrutiny should apply because "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." Pl. Summ. J. Mem. at 12 (quoting *Dunn*, 405 U.S. at 351). This equal protection argument is without merit. Write-in voters or candidates are not a suspect class entitled to heightened scrutiny. *See AFL-CIO v. United States*, 195 F. Supp. 2d 4, 10-12 (D.D.C. 2002) (explaining equal protection analysis and identifying suspect classifications, such as race and national origin); *cf. Burdick*, 504 U.S. 428 (upholding state's ban on write-in voting).

Plaintiffs Jansen, Kampia, and Rumenap had full access to the polls; their votes were cast; their votes were duly counted as write-in votes, as required by Section 806.12; and their votes would have been further tabulated on a candidate-by-candidate basis, pursuant to Section 806.13, if there had been a sufficient number of write-ins to have a determinative effect on the election. Accordingly, any burden placed by Section 806.13 on Jansen, Kampia, and Rumenap's right to vote is slight.

Consideration of the burden on the associational interests of Plaintiffs Barr and the Libertarian Party leads to the same conclusion. Plaintiffs claim that Section 806.13 infringed the associational rights of Barr and the Libertarian Party, including their constitutional right to create and develop a new political party. Plaintiffs assert that "the Board's failure to certify and report

17

valid write-in votes cast for Plaintiff Barr impaired [the] 'basic function' of Plaintiff Libertarian Party" to "select candidates for public office to be offered to the voters at general elections."  Pl. Reply Mem. at 5 (citing *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973)).  Plaintiffs further claim that the "Libertarian Party is entitled to know whether its stature has grown or been diminished by the votes cast for Barr," and that Section 806.13 deprived them of "this vital information, laden with associative and communicative value."  Pl. Summ. J. Mem. at 10-11.

First, for the purpose of constitutional analysis, the rights of Barr and the Libertarian Party in connection with the election itself are not substantially different from the rights of the voters.  *See Burdick*, 504 U.S. at 438 ("the rights of voters and the rights of candidates do not lend themselves to neat separation.") (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).  Therefore, the analysis above regarding the voting rights of Plaintiffs Jansen, Kampia, and Rumenap is equally applicable to Plaintiffs Barr and the Libertarian Party.

Second, while it is true that courts will apply strict scrutiny to laws that directly impact the "basic function" of selecting a party's candidates or laws that severely burden the constitutional right of citizens to create and develop new political parties, *see, e.g.*, *Tashjian*, 479 U.S. at 215-17, *Norman*, 502 U.S. at 288-289, Section 806.13 did not affect any basic functions of the Libertarian Party.  No facts suggest that Section 806.13 placed any burden on Barr or the Libertarian Party in terms of ballot access.  Plaintiffs admit that Plaintiff Barr was nominated as the Libertarian Party candidate and ran as a qualified write-in candidate in the 2008 election.  Pl. Stmt. of Mat. Facts ¶¶ 6, 8.  Plaintiffs also admit that Jansen, Kampia, and Rumenap were selected and qualified as Libertarian Party candidates for presidential elector from the District of Columbia pledged to Barr, and that write-in votes were cast for Barr in the November 2008 election.  *Id.* ¶¶ 6-10.  The Libertarian Party was and remains free to organize itself, to

disseminate its views, to select, nominate, and field candidates – and to win elections – in the District of Columbia. Thus, the claim that Section 806.13 impaired the party's basic functions or its ability to select candidates is without merit.

The crux of Plaintiffs' complaint is that they were constitutionally entitled to know *precisely* how well Barr fared at the polls and that the Board's failure to provide this information constitutes a severe burden on their rights. The Board's reporting of the write-in vote total did, however, provide Plaintiffs with information about how well Barr fared: Specifically, Plaintiffs know that he received between 3 and 1,138 votes out of a total 265,853 votes cast – at most, less than 0.5 percent of the total vote. Plaintiffs also know substantial information about how Barr and the Libertarian Party fared nationally, considering that they note that Barr "polled more popular votes nationwide than any Libertarian presidential candidate since Ed Clark in 1980." Pl. Supp. Mem. at 2. Plaintiffs assert that it is important for them to know their exact vote total because minor party voters "cast their votes hoping to increase a candidate's vote total," even though they "almost never expect those candidates to win." Winger Decl. ¶ 5. According to Plaintiffs, a typical minor party voter seeks to "gain satisfaction knowing that he or she has helped to boost the candidate's total." *Id.* That may be so, but the Supreme Court has specifically held that the primary function of elections is to elect candidates. *See Burdick*, 504 U.S. at 438. Accordingly, the Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Id.*

Plaintiffs' supplemental brief in support of their motion for summary judgment raises an additional argument for why Plaintiffs need a precise vote count. Plaintiffs contend that a precise count is crucial because under 26 U.S.C. §§ 9003 and 9004, a minor party presidential candidate who polls at least 5 percent of the national vote qualifies for public funding in the next

general election.  Pl. Supp. Mem. at 1-2.  Yet, Plaintiffs note, the official results of the 2008

election published by the Federal Election Commission ("FEC") did not credit Barr with

receiving any votes in the District of Columbia.  *Id*.  On the facts of this case, however, Plaintiffs

cannot demonstrate that the Board's actions pursuant to § 806.13 caused them any conceivable

harm related to the availability of public campaign funding.  According to the FEC results, Barr

received 523,686 votes out of 131,257,328 nationally, or 0.40%.  Even if all 1,138 write-in votes

from the District of Columbia were allotted to Barr, his vote total would still be approximately

0.40% — nowhere near the 5% threshold required for public funding.  In *Buckley v. Valeo*, the

Supreme Court rejected the argument that the public funding threshold percentage requirements

themselves infringed the constitutional rights of minor parties.  424 U.S. 1, 97 (1976).  In so

holding, the Court noted that "we of course do not rule out the possibility of concluding in some

future case, upon an appropriate factual demonstration, that the public financing system

invidiously discriminates against nonmajor parties."  *Id*. at n.131.  Similarly, the Court here does

not rule out the possibility of a case in which § 806.13, as applied, could implicate constitutional

harms, either on its own or in conjunction with the public financing statute.  The Court, however,

must rule based on the actual facts of the case.  *See Fund For Animals v. Williams*, 311 F. Supp.

2d 1, 5 (D.D.C. 2004) ("[T]he Supreme Court has held that Article III's case-or-controversy

requirement prohibits courts from issuing advisory opinions or decisions based on hypothetical

facts or abstract issues.") (citing *Flast v. Cohen*, 392 U.S. 83, 96 (1968)).  In this case, the

application of § 806.13 had no bearing on Plaintiffs' ability to obtain public campaign funding.

While Plaintiffs naturally would like to know their exact vote total, there is no

constitutional mandate that they be provided with this information at the public's expense,

provided that their votes have been duly counted and determined to have no effect on the

election's outcome.[8]  The burden Section 806.13 puts on Plaintiffs' constitutional rights is accordingly very limited.

### b.  Government Interests

The Court turns next to the second step in the *Anderson-Burdick* analysis – the interests asserted by the District of Columbia to justify the burden imposed by § 806.13.  Since the Court has already concluded that the regulation's burden is slight, the District does not need to establish a compelling interest to justify the rule.  Under the *Anderson-Burdick* analysis, when an election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the constitutional rights of voters, "the State's important regulatory interests are generally sufficient to justify the restrictions."  *Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 788) (internal quotation marks omitted).  Here, the District's regulatory interests trump Plaintiffs' limited interest in having write-in votes tabulated and reported on a candidate-by-candidate basis

In its submissions, the Board has identified reasonable interests that adequately justify § 806.13, including the (1) efficient and expedient reporting of election results, (2) reduction of election administration costs, and (3) the promotion of faith in the certainty of election results. Def. Mem. in Opp. to Pl. Summ. J. Mot. at 16.  The District clearly has a legitimate interest "in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."  *Timmons*, 520 U.S. at 364.  No "elaborate, empirical verification of the weightiness of the State's asserted justifications" is required.  *Id.*

The Board currently uses a voting system in which paper ballots are processed through a ballot tabulator.[9]  Declaration of Rokey Suleman, Executive Director of the D.C. Board of

---

[8] While on the facts of this case the Constitution does not compel the reporting of each candidate's write-in total, the District of Columbia obviously could decide to amend its election regulations to provide for the reporting of each candidate's write-in results in a manner that would minimize costs and administrative burdens by, for example, providing a mechanism for a write-in candidate to pay for the tallying of the write-in votes.

Elections and Ethics, dated Jan. 6, 2010 ¶ 5. The tabulator can read that a voter selected a write-in candidate for a particular race, but the Board must manually review the ballot in order to determine *which* write-in candidate the voter selected. *Id.* If the Board were required to tabulate the write-in votes cast in a single, district-wide election, it would need to collect the write-in votes from the 143 precincts of the District of Columbia and then tally them by hand. *Id.* ¶ 6. In order to accomplish the tallying, the Board would need to hire and train temporary employees to conduct that work, which, according to the Board's Executive Director, would take "at least a few weeks to complete." *Id.* While such an extensive delay may not be necessary given the relatively small number of write-in votes, even if the increased reporting time only took a few additional days, the Board still has articulated a legitimate interest in the efficient reporting of election results.[10] The Court finds that requiring the Board to tabulate non-determinative write-in votes by hand would likely increase the expense of administering an election, cause delay in reporting the certified election results, or both. Accordingly, the Board has advanced reasonable interests in efficiency and cost-effective election administration that justify § 806.13. The Board also has a reasonable, legitimate interest in promoting public confidence in the electoral system and its results by ensuring efficient and cost-effective election administration.[11]

---

[9] At oral argument, counsel for the Board presented several details about the conduct of elections in the District of Columbia that were not reflected on the factual record, despite the fact that this case has been pending in this Court for almost two years and despite the fact that the Court's order of February 2, 2011 explicitly directed the parties to "present any additional material that is pertinent" by February 12, 2011. Accordingly, the Court does not base its ruling on any factual representations that were presented at oral argument and that are not also reflected in the prior factual record.

[10] The delay refers to the reporting of the certified results which ordinarily occurs 10 to 15 days after the election, not the reporting of unofficial results which occurs on election night. Plaintiffs indicated at oral argument that their claim is not concerned with the reporting of the unofficial results on election night.

[11] While it is true that states and, as relevant here, the District, have "a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries," *Anderson*, 460 U.S. at 795, the District's interests here are still sufficiently important to justify the regulation in light of the slight nature of any burden to Plaintiffs' rights and by virtue of the fact that § 803.16 has no effect on access to voting itself, but rather concerns only the manner in which votes are publicly reported.

### III. Conclusion

"[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and [Fifth] Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434. Here, the Board has identified sufficient regulatory interests to justify § 806.13 and any slight burden it may place on Plaintiffs' constitutional rights.

Plaintiffs' remaining arguments are without merit.

Accordingly, summary judgment is GRANTED for Defendants and DENIED for Plaintiffs.

Date: March 8, 2011

_/s/ Beryl A. Howell_
BERYL A. HOWELL
United States District Judge